IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

               Plaintiff

v.

BRANDON D. JOHNSON,

               Defendant.

REPORT AND
RECOMMENDATION

08-cr-94-bbc

_____

## REPORT

The grand jury has charged defendant Brandon D. Johnson in a five-count indictment with trafficking heroin. Before the court are Johnson's motion to suppress post-arrest statements he made during his second and third interviews (dkt. 11) and motion to quash the search warrant for his residence (dkt. 12). For the reasons stated below, I am recommending this court grant the motion to suppress statements made during the second interview, deny the motion to quash the warrant and deny the motion to suppress statements made during the third interview.

On July 31, 2008, this court held an evidentiary hearing. Having heard and seen the witnesses testify, having made credibility determinations, and having considered the exhibits, I find the following facts:

### Facts

Sometime in late 2007 or early 2008, the local drug task force began investigating Brandon Johnson for suspected heroin trafficking. Agents at the city, county and federal level were part of the investigation. By early April 2008, agents obtained an arrest warrant for Johnson on state drug charges and were waiting for an opportunity to execute it. On April 3, 2008, the property manager for Raymond Ridge Townhomes advised investigators that Johnson had been seen at 6739 Raymond Road. On April 4, 2008, agents staked out this residence.

Around midday, a Cadillac driven by a man later identified as Major Lemon drove to 6739 Raymond Road. The garage door for the residence opened, Johnson walked out, entered Lemon's car, and drove off with him. Lemon and Johnson drove to the West Towne shopping mall, parked and stepped out of the Cadillac. Task force agents arrested Johnson and took him to the west side district police station to attempt an interview. Other officers searched the Cadillac and found in the front center armrest 10 to 20 bags of a substance that field-tested positive for the presence of heroin. Lemon told officers that the heroin belonged to Johnson, who had shown the bags to Lemon upon entering the car, placed the bags in Johnson's coat pocket, then placed them into the armrest of the vehicle when they got to the shopping mall.

Shortly after Johnson arrived at the police station, around 1:25 p.m., task force member Deputy Sheriff Owen Dockter, took Johnson to an interview room to speak with him. U.S. Deputy Marshal Paul Sever also was present.[1]

Following his usual practice, Deputy Dockter wished to give Johnson the opportunity to help himself, that is, to "do [his] source or do someone that's a bigger drug deal." Transcript. of July 31 Hearing, Dkt. 15, at 10. Deputy Dockter basically told Johnson that he had been arrested on a warrant arising out of a drug charge, that suspected heroin had been found in the Cadillac, and that the police were interested in his residence from which they had tailed him to the mall. During this recitation, Johnson responded that he had not been aware of the arrest warrant, the drugs in the car were not his, and it wasn't his residence where they had seen him.

---

[1] Because Johnson is not directly challenging the voluntariness of his post-arrest statements, I will forego recitation of background facts that might affect a voluntariness determination.

Johnson concluded by declaring that he didn't want to talk. *Id*. at 11.[2] Deputy Dockter sought to clarify, asking Johnson "if he wanted to remain silent." Johnson responded, "Yes." *Id*. at 12.

Deputy Dockter ceased the conversation other than to ask background information about Johnson's home residence for booking purposes. Deputy Dockter and Deputy Sever then walked Johnson out to Deputy Sever's car so that he could be taken to the Dane County Jail for booking. The entire conversation had lasted three or four minutes.

While the deputies were putting Johnson in the car, DEA Special Agent Craig Grywalsky approached and asked Deputy Dockter how the interview went. Deputy Dockter responded that Johnson had stated he wanted to remain silent, that Deputy Dockter had not read Johnson his rights, and that was the end of it.

Agent Grywalsky was not ready to throw in the towel, so he approached Johnson in the squad car in the hopes of eliciting information from him. Standing next to the car in which Johnson was seated, Agent Grywalsky introduced himself as a federal agent, told Johnson that he was a target of a federal investigation and that this investigation was serious, but that nothing had been charged yet and nothing was written in stone on a federal level. Agent Grywalsky advised Johnson that if Johnson wished to speak to Agent Grywalsky, he still could do so, but they would have to go back in the precinct, sit down and do it properly. Agent Grywalsky told Johnson that in order to do this, he would have to advise Johnson of his rights and that this all was Johnson's decision to make, but he would have to make it before he was transported to the jail. Approximately 25 minutes had elapsed since Deputy Dockter's attempted interview of Johnson.

---

[2] Deputy Dockter testified that Johnson "did not want to talk at this time," a qualifier that the government has seized with both hands. Deputy Dockter did not record this interview attempt and I do not find that Deputy Dockter was quoting Johnson verbatim, so I do not attribute these three words to Johnson.

Johnson responded that he was willing to listen to what the task force agents had to say, to go back into the station and hear them out.  Deputy Dockter and Agent Grywalsky brought Johnson back into another interview room similar to the first.  Deputy Sever also was present.  Agent Grywalsky read Johnson his rights from a preprinted *Miranda* card.  Johnson was slow and guarded in his responses, but affirmed that he would speak to the agents.  Johnson took his time answering questions.  This interrogation lasted about 15 minutes.

Task force agents then applied to the state circuit court for a search warrant directed at 6739 Raymond Road.  They included in their application admissions that Johnson had made during the second interview.  Contraband was recovered from the residence.

Johnson subsequently was taken to the Dane County Jail and booked.  At about 8:00 p.m. that same evening, two different task force agents–Denise Markham, a Madison police officer, and Dorothy Reitzler, a Madison police detective–met with Johnson to interview him again.  Markham and Detective Reitzler had been told by fellow agents that Johnson initially had stated his wish to remain silent, had changed his mind, and had received *Miranda* warnings prior to making a statement to Agent Grywalsky.  Officer Markham and Detective Reitzler did not re-advise Johnson of his *Miranda* rights, simply stating that they were aware his rights had been provided to him earlier that day during a previous interrogation.  The focus of their questioning was to solicit Johnson's help in finding a murder suspect, but they did discuss with Johnson the drugs found at the residence during execution of the search warrant and did elicit incriminating admissions from Johnson.  This interview lasted about an hour.

ANALYSIS

I. The Second Interrogation of Johnson Was Improper

Johnson seeks to suppress his self-incriminating statement to Deputy Dockter and Agent Grywalsky at the West Side precinct house. This actually is a closer question than it might appear under a rigid application of *Michigan v. Mosley*, 423 U.S. 96 (1975), but too many questionable circumstances coalesced too quickly for this court to endorse the agents' good faith attempt to resuscitate the failed first interview attempt.

The parties do not significantly dispute the facts or the relevant case law. The parties *do* significantly dispute how to interpret the facts and how to apply the law to these facts. We can dispose quickly of a few of the government's least persuasive characterizations of the facts: the government implies that Johnson's interaction with Deputy Dockter was not actually an interrogation, that Johnson had no right to remain silent because he had not yet been *Mirandized*, and Johnson's statement that he wished to remain silent was equivocal because Deputy Dockter's attribution to Johnson of the qualifying phrase "at this time" suggests that this invocation was temporary and situational.

These first two characterizations of events border on casuistry. It is pellucid from Deputy Dockter's testimony that he took Johnson to an interview room in order to interview him. Deputy Dockter's opening recitation to Johnson provoked a string of verbal responses from Johnson before Deputy Dockter even turned the floor over to Johnson to allow Johnson the chance to "help himself" by admitting to drug dealing and "doing his source." Although Deputy Dockter does not recall with certainty, he may have framed his invitation for Johnson to help himself as a question. Regardless, interrogation includes any words that agents should know are reasonably likely to elicit an incriminating response from a suspect. The latter portion of this

5

definition focuses primarily on the perception of the suspect rather than the intent of the police. *Rhode Island v. Innis*, 446 U.S. 291, 300- 301 (1980). It is the functional equivalent of questioning for an agent takes a suspect to an interview room and, without *Mirandizing* him, advise that cooperation could accrue to his benefit. *Killebrew v. Endicott*, 992 F.2d 660, 663 (7th Cir. 1993). This is more than and different from briefly reciting to a suspect the reason for his arrest, which alone is *not* the functional equivalent of questioning, *see Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995); *see also Easley v. Frey,* 433 F.3d 969, 974 (7th Cir. 2006)(agent's statement regarding the evidence and possible consequences of the charges suspect faced do not rise to the level of interrogation because such information may contribute to the intelligent exercise of suspect's judgment regarding what course of conduct to follow). In other words, it does not constitute questioning to tell a suspect "we have overwhelming evidence that you sold heroin." It *does* constitute questioning to add ". . . and this meeting is your opportunity to help yourself by doing your source for us."

Second, for the government to imply that an arrestee cannot effectively invoke his right to remain silent until his interrogator advises him that the right exists stands the concept on its head and shakes it by the ankles. Undoubtedly the world would be a merrier place for task force agents if an arrestee's right to remain silent during custodial interrogation did not vest until the interrogator broached the topic. But a person in Johnson's situation–formally arrested and explicitly offered the chance to 'fess up–is allowed to engage in a little self-help by invoking his right to remain silent before his interrogator pulls the *Miranda* card from his wallet. This is not a false start that DQs the Fifth Amendment.

Finally, as noted in the fact section above, I doubt that Johnson qualified his decision to remain silent by actually saying "at this time," so I have not found it as a fact.

What's left is an arrestee in state custody who invokes his right to remain silent to a county deputy sheriff prior to receiving *Miranda* warnings during an interview attempt. Twenty-five minutes later and about a minute before the door literally shuts on the transport, a DEA agent introduces himself to the arrestee. The agent knows that the arrestee has invoked his right to remain silent and the agent intends to change his mind. The agent explains that this investigation may go federal but that no final decisions have been made as to who's a sheep and who's a goat. He asks the arrestee if he is interested in re-opening the interview and tells him that he has to decide now, before he is transported to the jail. The arrestee responds that he would like to listen to what the agent has to say. An interview begins in the same police facility with the same deputies as before with the DEA agent added in. Full *Miranda* warnings follow, the arrestee slowly acknowledges his understanding of his rights, listens to the agent's recitation and with cautious deliberation answers questions posed to him, incriminating himself along the way.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), Johnson had the right to remain silent, and the agents, perforce, were required to honor his decision. In *Michigan v. Mosley*, 423 U.S. 96, 102-03 (1975), the Court clarified that *Miranda* cannot be read to create a per se proscription against any further questioning by any police officer on any topic; instead,

> The admissibility of statements obtained after the person in custody had decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored.

423 U.S. at 104.[3]

---

[3] "Scrupulously" means "with extreme conscientiousness" (wordnet.princeton.edu/perl/webwn); "in a careful manner, with scruple; done with careful attention to detail" (en.wiktionary.org/wiki/scrupulously). The Court didn't have to modify "honored" at all, or it could have used a weaker adverb. Assuming that the Court chose its modifier with care, it set a high bar for the government, higher than some courts are willing to acknowledge in their application of *Mosley* to challenged confessions.

The Court in *Mosley* established a multifactor test to determine whether agents honor a decision to remain silent with sufficient scruple.[4] That said, in a subsequent gloss of *Mosley*, the Seventh Circuit indulged its penchant for distilling multifactor tests down to a Yes/No question, holding that

> the constitutionality of a subsequent police interview depends . . . on whether the police, in conducting the interview, sought to undermine the suspect's resolve to remain silent.

*United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998). The court explained:

> This approach naturally follows from *Mosley,* which neither elevates any one factor as predominant or dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession was obtained in a manner compatible with the requirements of the Constitution.

*Id.*

Applying this law to the material facts as found by this court establish that the agents did not scrupulously honor Johnson's right to remain silent. As Agent Grywalsky candidly admitted, his intent in approaching Johnson after Johnson had invoked his right to remain silent was to change Johnson's mind. Certainly he did so in good faith, but his attempt was simultaneously too late and too early. It was too late because Agent Grywalsky should have made his pitch in tandem with Deputy Doctker so that Johnson possessed *all* of the facts relevant to his decision before asserting his right to remain silent. It was too early because, having missed out on a joint presentation, Agent Grywalsky was stuck with Johnson's decision and was required to wait

---

[4] Courts are to consider whether *Miranda* warnings were provided before the first interrogation, how much time has elapsed between interrogations, whether the second interrogation involved the same crime or different crimes, whether new *Miranda* warning were provided prior to the second interview; and the persistence which agents pursued further interrogation once the suspect had invoked his right. 423 U.S. at 104-05.

longer to make his pitch. A 25 minute gap, while Johnson still was in Deputy Dockter's thrall, was too close in time, location, subject matter and personnel to comply with *Mosley*. It didn't help that Agent Grywalsky tossed in an "act now or it's too late" rider, thereby increasing the pressure on Johnson to abandon his decision not to talk. Although Agent Grywalsky's pitch did not violate every *Mosley* factor, it violated most of them, and it merits a "Yes" answer to the Seventh Circuit's test: Agent Grywalsky was seeking to undermine Johnson's resolve to remain silent.

Using the language employed by the Seventh Circuit in *Schwensow* keeps the analysis focused but it unfairly implies that Agent Grywalsky acted with *scienter*. He did not. I find that Agent Grywalsky was trying in good faith to convince Johnson voluntarily to change his mind by providing Johnson with material facts that might change how Johnson calculated the metrics of his situation.[5] The nuances of *Miranda* jurisprudence are such that the task force wound up with an unusable statement. Actually, that's not completely true: as discussed next, the agents still can use Johnson's statement to bolster their search warrant application. But they should not be allowed to use this statement against Johnson during the government's case in chief at trial.

II. The Search Warrant Was Valid

In his motion to quash the search warrant for his residence, Johnson argues that this court must redact from the task force's search warrant application all of his statements made

---

[5] Johnson's perspective might be more cynical: after he invoked his right to remain silent, a federal agent inveigled him to rescind his decision by dangling the lure of avoiding federal indictment if he talked; he talked, then got indicted anyway. To paraphrase Boon & Otter's remonstration to Flounder in Animal House, "You screwed up--you trusted us!"

during his second interview, then determine whether what remains provides probable cause for the search. *See* dkt. 17 at 10-11. The government makes the legally correct counterargument, *see* dkt. 19 at 18-19, but fails to employ the twelve-pound mallet that drives home its point: in *United States v. Patane*, 542 U.S. 630 (2004), the Court held that physical evidence derived from *Miranda* violations was not suppressible under the exclusionary rule. *Id.* at 633-34 and 637. The exclusion of statements obtained in violation of *Miranda* is a complete and sufficient remedy, so the Court saw no need to extend (and therefore no justification for extending) the prophylactic rule of *Miranda* to physical evidence derived from such violations. *Id.* at 643. Johnson is not entitled to redact the search warrant affidavit, the sufficiency of which he does not otherwise challenge.

Apart from this, it appears that even the redacted affidavit would have established probable cause to support the challenged search, but there is no need to develop this argument. This court should deny Johnson's motion to quash the search warrant.

III.  The Third Interrogation of Johnson Is Sloppy But Admissible

The final interview of Johnson that day defies neat categorization. Both Johnson and the government analyze it under *Mosley*. Given where we have landed, this might be a sound approach, but there are potential pitfalls. Johnson invoked his right to remain silent during his first interview but revoked the invocation for his second. I have found that the second interview was too similar to the first to be separated from it, so for the purposes of this section, we can view the first and second interviews as one combined interview, during which Johnson was provided *Miranda* warnings and during which he invoked his right to remain silent.

This might be an oversimplification because the widdershins sequencing: Johnson invoked his right to remain silent, then was *Mirandized*, then provided a statement. Like the defendant in *Oregon v. Elstad*, 470 U.S. 298 (1985), the possibility existed that Johnson might have felt that once he let the cat out of the bag by talking to Agent Grywalski and Deputy Dockter, he may as well talk to Officer Markham and Detective Reitzler. Of course, the Court in *Elstad* rejected this argument, but it based its rejection on the fact that the second interviewers had provided a fresh set of *Miranda* warnings, among other things. *Id.* at 318. So if *Elstad* were controlling, then suppression likely would result because the evening interviewers did not perceive any need to re-advise Johnson of his *Miranda* rights. But nothing in the record suggests that Johnson is claiming his will was overborne. His suppression arguments are pure *Miranda/Mosley* with no claim of involuntariness.

So we circle back to *Mosley*. This time, the government is correct: however careless the agents' handling of *Miranda* warnings, they did not violate *Mosley*. Agent Grywalski had adequately *Mirandized* Johnson earlier that day and Johnson never subsequently invoked his right to remain silent. There were material changes in time, place, personnel and topic. As far as the evening interviewers knew, Johnson's decision to talk during the second interview was valid and they could rely on it. Therefore, this court cannot find that these agents, in conducting the interview, sought to undermine Johnson's resolve to remain silent. *United States v. Schwensow*, 151 F.3d at 659.

However disconcerting the approach of the agents, they did not violate Johnson's *Miranda* rights. They are, however, playing with fire.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court:

(1) Grant defendant's motion to suppress his statement to Deputy Dockter and Agent Grywalsky;

(2) Deny defendant's motion to quash the search warrant; and

(3) Deny defendant's motion to suppress his statement to Officer and Detective Rietzler.

Entered this 22nd day of August, 2008.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

August 22, 2008

Robert Anderson
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

Michael Lieberman
Federal Public Defender Office
222 West Washington Avenue, Suite 300
Madison, WI 53703

    Re:   United States v. Brandon D. Johnson
            Case No. 08-cr-094-bbc

Dear Counsel:

    The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

    The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

    In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before September 2, 2008, by filing a memorandum with the court with a copy to opposing counsel.

    If no memorandum is received by September 2, 2008, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                Sincerely,

                                /s/ M. Hardin for
                                Connie A. Korth
                                Secretary to Magistrate Judge Crocker

Enclosures
cc:     Honorable Barbara B. Crabb, District Judge